5 A.3d 60

## BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS

v.

## KOBA INSTITUTE, INC.

No. 2314, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Sept. 13, 2010.

402

Frank C. Derr, Baltimore, MD, for appellant.

David A. Branch, Washington, D.C., for appellee.

Panel: HOLLANDER, ZARNOCH and WRIGHT, JJ.

ZARNOCH, J.

In this case, we hold that sovereign immunity bars appellee, the Koba Institute ("Koba"), from bringing an unjust enrichment action against appellant, the Baltimore City Board of School Commissioners ("the Board"), an agency of the State. This conclusion is compelled by our recent decision in *Board of Education of Worcester County v. BEKA Industries, Inc.,* 190 Md.App. 668, 989 A.2d 1181 (2010), *cert. granted* 415 Md. 38, 997 A.2d 789 (June 9, 2010)—decided after this case was argued—and by Md.Code (1984, 2009 Repl.Vol.), State Government (SG) Article, § 12–201. We also reverse for other reasons set forth below and overturn the November 24, 2008 circuit court judgment reflecting the jury verdict of $169,640 in favor of Koba.[1]

---

**1.** In fairness to the parties and because the sovereign immunity question is still in play in the Court of Appeals, we will address the major issues raised in this appeal.

## FACTS AND PROCEEDINGS

Koba is a Maryland corporation that in 2001 operated two nonpublic, licensed secondary special education schools for emotionally and behaviorally disturbed children. Before the two schools merged in August 2002, these facilities were the Focus Point School and the Meadow Brook Education Center in Anne Arundel County.

In 2001–02, twelve Baltimore City public school students, who were temporarily housed in a group home, Bethany House in Talbot County, were referred to Koba for educational services. Seven were referred by the Baltimore City Department of Social Services (BCDSS); three by the Baltimore City Public Schools; one by what is now the State Department of Juvenile Services (DJS); and one by the East Baltimore Mental Health Center.

When it received a request to place a child from the Baltimore City Public Schools, Koba would send admission and tuition information to the school system, including a query on how the system wanted to handle transportation. One such letter, dated September 17, 2001, to an employee of the City School System involving one of the twelve city students, stated:

> If requested Meadow Brook will arrange for the transportation of [the student] to and from our school at the rate of $80.00 per day. However, you may opt to arrange for separate transportation services from any source. If you elect to have Meadow Brook arrange for transportation, invoices will be sent at the beginning of the month of service and will be submitted separately from invoices for basic educational services.[2]

---

2. In the record in this case are copies of three identical 2001–02 memos from the Focus Point School to "Local Education Agencies and Other Funding Agencies" regarding State Transportation Policy. The memos stated:

 1) We provide transportation when needed at $80.00 per student per school day. The home county or referring agency retains the

Under the apparent belief it would be reimbursed for the service, Koba subsequently arranged with the Facility Operation Center of America (FOCA) to provide transportation services to the twelve children and began to receive billings from the subcontractor. Without a written contract with the Board, Koba, in January 2001, started to submit monthly invoices for each student's education to the Baltimore City School System. In addition, it sent separate bills for each student's transportation services primarily to BCDSS, with a copy to the City School System.[3] The School System apparently received the invoices, because, for the next nine months, it paid Koba at the $80/day rate.[4] Then, it began to question whether the Board was obligated to pay for transportation services to students temporarily living in Talbot County. In September, 2001, Veronica Washington, Coordinator of the City School System's Office of Nonpublic Services, wrote in a letter to BCDSS that:

1. Talbot County will not transport these students to Anne Arundel County;[5]

---

 option to transport students themselves or arrange transportation from any source they choose.

2) Transportation invoices will be sent out at the beginning of the month of service, and will be submitted separately from invoices for basic educational services.

3) Transportation will be charged in cases of student absence unless the school is given at least two calendar days notice in advance.

4) Students will be transported in appropriately licensed and insured company vehicles properly equipped with safety belts and air conditioning.

3. Of the 128 unpaid invoices in the record for 2001–03, 108 are addressed to BCDSS, 11 are addressed to the City School System (from May–July 2003), and 9 are addressed to DJS.

4. Koba's president testified that "on occasion," BCDSS also paid for these transportation services.

5. At trial, at one point, Washington testified that she sent a Koba bill to the Talbot County Board of Education, but did not receive reimbursement. Later, she said the City School System did not bill Talbot County for transportation services, because the subdivisions "reciprocated" without money exchanging hands.

2. The placement of the special needs students "was done without collaboration with BCDSS;" and

3. In the 2001–02 school year, the City School System "will not pay to transport their students from the Bethany House to Anne Arundel County."

Koba was not sent a copy of this letter.[6]

In November 2001, Koba's contact with the School System, Edie Tress, orally informed the school that as of December 1, 2001, the School System would not pay for the transportation services. The City School System sent out the last 2001 check in December.[7] Nevertheless, Koba continued to arrange for transportation of the children and to bill for the services. For fleeting brief periods in 2002 and 2003, the School System paid Koba additional amounts. On August 15, 2002, the City School System sent Koba a check for $3,040 covering two November 30, 2001 invoices and, on August 31, 2003, it sent Koba a check that included $1,120 in transportation costs in response to a July 31, 2003 invoice. According to evidence in the record, this last invoice related to transportation for a single student from July 14, 2003 to July 31, 2003. The last unpaid invoices were dated July 7, 2003, for transportation of five students in June of 2003. No more transportation payments were forthcoming. During this entire period, Koba billed and was paid for providing educational services. On February 9, 2004, Koba's president made a final written demand to the school system for payment of the transportation costs, a demand that was obviously rejected.

---

6. Washington later testified that the reason she did not send a letter to Koba in 2001 was "[b]ecause I had been in constant[,] almost daily conversation with the Koba Institute in regard to this transportation issue" and "[t]hey were very much aware of the school district's position."

7. When asked why she initially authorized payment of the invoices, Washington replied: "I paid the invoices because they were received in my office and I was relatively new to the office. And I authorized the payment of the invoices unbeknownst that I wasn't responsible for the transportation invoices—or the Baltimore City Public School System wasn't responsible."

■ After failing in attempts to seek the intervention of the Maryland State Department of Education and others [8] and to invoke the jurisdiction of the U.S. District Court,[9] Koba filed suit in the Circuit Court for Baltimore City on July 6, 2006. After some initial procedural skirmishing, Koba, on March 26, 2007, filed a First Amended Complaint, advancing two counts: 1) breach of statutory obligation; and 2) unjust enrichment. In response, the Board filed a two-page boilerplate answer, raising twenty-five defenses, including limitations and immunity. After another flurry of motions, the statutory claim fell out and the case went to trial before a jury on the unjust enrichment count.

---

**8.** At trial, Koba's president testified that the State Department reviewed the transportation invoices "in an effort to resolve the dispute about payment." However, an April 14, 2003 letter from an Assistant Attorney General representing the State Department to Koba's lawyer rejected any attempt to invoke the Department's jurisdiction:

> The facts of your letter describe a dispute between your client and BCPSS over nonpayment for transportation costs for students transported to Focus Point School. Enforcement of agreements between local school systems and non-public providers of special education and related services are matters between those entities and are outside of MSDE's jurisdiction to intervene or to investigate as a complaint pursuant to COMAR 13A.05.01.15A or 34 CFR 300.362. Accordingly, MSDE declines your request to intervene in this dispute between BCPSS and your client and cannot initiate an investigation into your concerns.

**9.** On March 18, 2004, Koba filed suit in the U.S. District Court for Maryland against both the State Department and the Baltimore City Board of School Commissioners alleging violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400–85 (IDEA), and state claims for breach of contract and *quantum meruit*. Upon the defendants' motion, Judge William Nickerson, on October 12, 2004, dismissed the IDEA suit because a third party contractor lacked standing under both federal and State statutory provisions and declined to exercise supplemental jurisdiction over the state law claims. *Koba Inst., Inc. v. Maryland State Dept. of Educ., et al.*, Civ. Act. No. WMN–04–785 (D.Md. Oct. 12, 2004). Such a dismissal is not a judgment on the merits for *res judicata* purposes. *See Cayer Enterprises, Inc. v. DiMasi*, 84 Conn.App. 190, 852 A.2d 758, 760–61 (2004) (collecting cases); and *Batterman v. Wells Fargo Ag. Credit Corp.*, 802 P.2d 1112, 1118 (Colo.App.1990) (collecting cases).

Central to Koba's unjust enrichment claim was an alleged violation by the Board of Md.Code (1978, 2008 Repl.Vol.), Education (ED) Article § 8–410(b)(1), which provides:

> Except as provided in paragraph (2) of this subsection, the local school system of the county in which the child with a disability resides shall certify and pay the cost of his daily or other reasonable transportation to school under the rules and regulations adopted by the State Board if:
>
> (i) The school is outside this State or the county in which the child resides; and
>
> (ii) State aid has provided for the education of the child under this subtitle.[10]

Koba contended that because the disabled children "resided", *i.e.* were domiciled in Baltimore City, the statute obliged the Board to pay transportation costs to a school, like Koba, that was outside the City. The Board countered, in the words of its sole witness, Ms. Washington, that under § 8–410(b)(1), "where ... student[s] [are] in temporary residence[,] where they lay their heads on ... the night before, [that] county is responsible for transportation costs." Thus, the Board argued that the Talbot County Board, not the City School System, was under a duty to pay transportation costs for the twelve city students.[11]

The parties also clashed over how the Board was "enriched" or benefitted by Koba's services. Koba asserted that State funds were provided to the Board to pay for transportation for

---

10. A related provision is ED § 8–410(a), which states:

 Each local school system shall provide or arrange for the transportation during the regular school year of each child with a disability who is in a placement approved in conformity with this subtitle and applicable regulations of the State Board and standards in:

 (1) A public school;

 (2) A school maintained by a State agency; and

 (3) A nonpublic school.

 Although the term "local school system" is not defined in the ED Article, the word "County" includes Baltimore City. ED § 1–101(c).

11. Washington testified that the Talbot County School System would not transport the children because it "could not transport the kids across the bridge" into Anne Arundel County.

disabled students, a total of $15 million for the 2002–03 school year. The Board responded that each year's State transportation grant was based on a headcount of students transported the year before and that, because the twelve students were not included in any count, the Board received no reimbursement for their transportation and no benefit from Koba's Services.

On November 20, 2008, the jury returned a verdict in Koba's favor of $169,640, computed on the basis of the $80/per day charges on the invoices. This appeal followed.

## QUESTIONS PRESENTED

The Board has asked us to review the following questions:

1. Did the lower court have jurisdiction to decide Koba's claim of unjust enrichment if Koba failed to exhaust mandated administrative remedies?

2. Did Koba produce any evidence to support its claim that the Board was unjustly enriched by Koba's services?

3. Was Koba's claim barred by the statute of limitations?

4. Did the Board's immunity require the trial court to reduce the jury's verdict to $100,000?

## DISCUSSION

Because the legal landscape on the contractual liability of school boards has changed since this case was briefed and argued, we will address the Board's fourth question at the outset.

### A. Sovereign Immunity

■ The Board's position on immunity has shifted a bit since the onset of this litigation. In the circuit court, the Board, pointing to cases involving the sovereign immunity of State agencies and to SG § 12–201 (waiving immunity only for written contracts), argued that the lack of an executed written agreement doomed Koba's quasi-contractual unjust enrichment claim. While not abandoning this argument, appellant

primarily contends here that the immunity conferred by Md. Code (1974, 2006 Repl.Vol.), § 5–518 of the Courts and Judicial Proceedings Article (CJP) applies to Koba's actions. Under that statute, local boards of education may not raise the defense of sovereign immunity to "any claim" of $100,000 or less, CJP § 5–518(c), but may raise the immunity defense to any amount claimed above the limit of its insurance policy or, above $100,000, if self-insured, or a member of an insurance pool, CJP § 5–518(b).

In *Board of Education of Worcester County v. BEKA Industries, Inc. ("BEKA"), supra,* this Court concluded that, despite the apparent breadth of the words "any claim[,]" the context and history of CJP § 5–518 led to the conclusion that the statute covers only tort, not contract actions against local boards. Because this is not a tort action, the Baltimore City Board of School Commissioners cannot rely on CJP § 5–518 in this case.

BEKA went on to hold that the contractual liability and immunity of a unit of State government, such as a board of education, was governed by Title 12, subtitle 2 of the SG Article.[12] Specifically, SG § 12–201(a) provides:

> Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a

---

12. In our view, there is no doubt that the Board is properly regarded as a State agency. At one time, the Baltimore City Board of School Commissioners had a local aura because Baltimore City was the only home rule subdivision with an express home rule power to establish and maintain a system of free public schools. Over the years, the General Assembly has limited this authority. Now, the City's express powers, codified in Article II of its Charter, include in Art. II (§ 30) the authority to establish and maintain free public schools "[s]ubject to the applicable provisions of the Education Article." *See also* ED § 1–202. Home rule issues aside, the Board bears all the key indicia of a State agency. *See A.S. Abell Pub. Co. v. Mezzanote,* 297 Md. 26, 38, 464 A.2d 1068 (1983). It is created and controlled by State law, ED § 3–108.1 and §§ 4–301 *et seq.* to serve a State purpose—the establishment and maintenance of a system of free public schools, Md. Const. Art. VIII, § 1 and ED § 4–302. And Board members are appointed jointly by the Mayor and the Governor from a list of individuals submitted by the State Board of Education. ED § 3–108.1(c).

court of the State, *based on a written contract* that an official or employee *executed* for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

(Emphasis added.) [13]

Maryland appellate cases have read this limited waiver strictly to deny liability for State units in the absence of a properly executed written contract. *See, e.g., Stern v. Bd. of Regents*, 380 Md. 691, 722, 846 A.2d 996 (2004); *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md.App. 766, 781, 471 A.2d 1121 (1984). Thus, SG § 12–201 would appear to bar appellee's unjust enrichment claim, which is grounded in an unwritten quasi-contract.

Koba makes two arguments why the relief it sought is not precluded by State law.[14] First, it argues that the decision of

---

**13.** The Board's brief refers to similar contract waiver language found in Md.Code (1957, 2005 Repl.Vol.) Art. 25A, § 1A. Presumably, this reference is made only for purposes of analogy, because Article 25A applies only to charter home counties, not Baltimore City, and certainly not to State agencies such as the Baltimore City Board of School Commissioners. A statutory waiver of contractual liability with respect to Baltimore City was not added to the law by the General Assembly until 2002. *See* Chapter 521, *Laws of 2002*. The Fiscal Note for this legislation (HB 452) observed:

> In practice courts do not allow Baltimore City to claim governmental immunity in contract matters. Thus, Baltimore City is liable in contractual actions to which the City is a party, but the City does not enjoy the one-year limit on filing of contractual actions and it is liable for punitive damages under current law.

In one critical respect, there is a difference between the contractual liability/immunity of Baltimore City and a State agency, such as a local school board. At common law, State agencies enjoyed immunity from contract actions, while political subdivisions and municipalities did not. *See Baltimore County v. RTKL Assocs.*, 380 Md. 670, 675, 846 A.2d 433 (2004). Whether this fact would warrant a different result in an unjust enrichment action brought against a local government, is an issue we need not resolve at the present time.

**14.** While the parties have not had the opportunity to discuss the impact of BEKA, they have made all the relevant and appropriate arguments for and against the application of SG § 12–201. Even, if the sovereign immunity issue had not been argued by the parties, we could raise the issue *sua sponte*. *Frosburg v. State Dept. of Personnel*, 37 Md.App. 18, 27, 375 A.2d 582 (1977).

this Court in *Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners,* 155 Md.App. 415, 843 A.2d 252 (2004), recognizes an unjust enrichment exception to the sovereign immunity doctrine. Second, appellee asserts that ED § 8–410(b)(1) itself waives any Board immunity from paying the transportation costs at issue here. We consider these contentions in order.

The short answer to appellee's first contention is that *Alternatives* does not stand for the proposition Koba asserts. Nor would it be possible for the case to be read as it suggests. *Alternatives* was an unjust enrichment case involving alleged benefits conferred upon the Baltimore County Board of School Commissioners, but was not a decision that changed the law on sovereign immunity. Judge Moylan's opinion in *Alternatives* is a thorough explanation of the common law element of enrichment/benefit overlayed over the backdrop of the common law nonliability of governmental entities for the unauthorized acts of one of its employees in arranging for a service from a third party. Noting that this rule of nonliability is grounded in protecting the public treasury from unauthorized expenditures, 155 Md.App. at 465, 843 A.2d 252, *Alternatives* recognized that, for purposes of an unjust enrichment claim, there was a distinction between the provision of a non-cash benefit to government and a cash benefit:

> When the benefit is in cash, the case for restitution is far less troubling. When the defendant is a governmental entity, there is no threat to the public treasury because the defendant is not being required to buy anything or to pay out any of its own funds. It is simply required to hand over the easily identifiable cash benefits by which it had been unjustly enriched. There is no cost. The public treasury has not been diminished and the status quo has not been disturbed.

*Id.* at 505–06, 843 A.2d 252. As a result of this distinction, this Court allowed an unjust enrichment claim to continue against the Board premised on the conferral of a cash benefit on the governmental entity.

Fueling Koba's argument is *Alternatives'* comparison of the rationale of protection of the public fisc in an unauthorized expenditure setting with this common justification for sovereign immunity. *Id.* at 422, 465–66 and 489, 843 A.2d 252. However, the public fisc rationale is not the only justification for the sovereign immunity of a State agency. *See Stern v. Bd. of Regents,* 380 Md. 691, 701, 846 A.2d 996 (2004); and *Magnetti v. Univ. of Md.,* 171 Md.App. 279, 287–88, 909 A.2d 1101 (2006), both noting that sovereign immunity protects the State from excessive interference with governmental functions *and* preserves control over state funds.

■ In addition, while at present, the elements of an unjust enrichment action are exclusively governed by the common law as interpreted by the courts, State sovereign immunity is no longer the sole province of the common law, but is regulated by statutes enacted by the General Assembly. The defense of sovereign immunity was abrogated in Maryland by Chapter 53, *Laws of 1786,* but was reinstated in less than 40 years. Chapter 210, *Laws of 1820.* This may explain the Court of Appeals' reluctance to judicially abrogate the sovereign immunity doctrine before the General Assembly addressed the issue in the 1970s and 1980s. *See, e.g., Jekofsky v. State Roads Comm'n.,* 264 Md. 471, 287 A.2d 40 (1972). When the Legislature reentered the area in 1976 to enact a limited waiver of State sovereign immunity in contracts, it expressly restricted the waiver to written contracts, leaving little, if any, room for a court to find a common law exception to SG § 12–201 on the basis of theories of quasi-contract or implied contract.

*Alternatives* acknowledged these vital distinctions between the remnants of sovereign immunity not statutorily waived and the common law elements of unjust enrichment. Taking note of *Granite Construction,* 57 Md.App. at 780, 471 A.2d 1121, the Court said: "However meritorious a claim based on an implied contract may be, if that claim is against the State or any of its agencies, it is barred because it is not based upon a written contract." 155 Md.App. at 492, 843 A.2d 252. Again turning to *Granite Construction,* we observed that "[e]ven if we were persuaded that MTA had been unjustly enriched . . .

we would be forced to conclude that sovereign immunity would be a complete bar to recovery." *Id.* at 495, 843 A.2d 252. Moreover, a close look at *Granite Construction* discloses that rebuffing the appellant's unjust enrichment claim simply because it was not based on a written contract and thus, was barred by sovereign immunity, was a distinct alternative ground to this Court "also" rejecting an implied contract "as a result of conduct on the part of an employee who was acting outside the scope of his employment." 57 Md.App. at 780–81, 471 A.2d 1121.

In addition, SG § 12–201(a) indicates that these are cumulative conditions to a sovereign immunity waiver. The absence of any one of them bars judicial relief.[15] For these reasons, we conclude that *Alternatives* does not create an unjust enrichment exception to the doctrine of State sovereign immunity preserved by SG § 12–201's insistence on a written contract.

[redacted] Koba's second contention—that ED § 8–410(b)(1) itself waives sovereign immunity—also lacks merit. The General Assembly may waive sovereign immunity either directly or by necessary implication. *ARA Health Servs. v. Dept. of Public Safety and Correctional Servs.*, 344 Md. 85, 92, 685 A.2d 435 (1996).[16] In *Katz v. WSSC*, 284 Md. 503, 512, 397 A.2d 1027 (1979), the Court of Appeals, quoting from earlier authorities, said that waiver should be found only "in cases of positive consent given, or by necessary and compelling implication." The language of § 8–410(b)(1) does not satisfy this demanding standard.

This statute is one of a number of interrelated and overlapping duty-to-pay provisions affecting the disabled school

---

15. Thus, *Alternatives* cannot be read, as Koba contends, to create an exception to sovereign immunity in cases without a written contract, if there is no evidence that a State officer or employee acted *ultra vires*.

16. An additional requirement for an effective waiver is a provision for payment of judgments. *BEKA*, 190 Md.App. at 709–10, 989 A.2d 1181. Because we find that § 8–410(b)(1) intended no waiver of sovereign immunity, we need not address this additional requirement.

children at the center of this case. *See* ED § 4–122(c)(4), 8–406(c)(1) and 8–415(d)(2), *discussed infra,* at pp. 26–30.[17] These statutory provisions demonstrate no singular or special concern for enforcing the rights of private contractors to receive payment for out-of-county transportation of special education students.[18] Rather, these laws appear more concerned with apportioning or assigning financial responsibility for educational and related services between various governmental units, *i.e.* the State and its subdivisions, and one local board of education or another.

In this regard, it is instructive to compare the statutory waiver of sovereign immunity in *Katz, supra,* 284 Md. at 513–

---

**17.** The language of § 8–410(b)(1), relied upon by Koba, was enacted in 1967 (Chapter 708, *Laws of 1967*)—still the heyday of sovereign immunity—and eight years before the passage of the federal legislation which has now become the IDEA and which was the backdrop for these later duty-to-pay provisions. When originally enacted, § 8–410(b)(1) did not create a singular or unequivocal obligation on the part of a local board of education to pay private contractors for transportation services for disabled children receiving an education in the course of an out-of-county placement. In fact, the 1967 legislation imposed the duty to pay on "the county," not the local board. In 1969, the word county was replaced with "subdivision." Chapter 405, *Laws of 1969*. It was not until 1975 that this term was changed to "board of education." Chapter 702, *Laws of 1975*. The 1975 legislation (HB 637), initially sought to impose a duty on local boards to "arrange" for transportation, contrary to the traditional method of reimbursing parents for the transportation. *See* Comments on House Bill 637, Morris W. Rannels, Maryland State Department of Education, House Ways and Means Committee, March 5, 1975. However, the word "arrange" was later deleted from the bill.

In addition to tying the obligation to receipt of State aid to education funds, the 1967 statute expressly required the State "to reimburse *the subdivision* for providing this transportation from the General Funds of the State." (Emphasis added.) Although the latter language was deleted in 1981 as part of a major revamping of the funding of State transportation costs, *see* Chapter 507, *Laws of 1981*, other provisions in the law recognized that the obligation to fund transportation costs, including those for disabled students, remained a joint one between the local governments and the State. *See* ED § 8–406(c)(1) and § 8–415(d)(2). In the current budget year, the cost of a nonpublic special education program is split on a 70 percent State/30 percent local basis. 3 *Maryland Budget* FY 2011 at III–55.

**18.** Historically, § 8–410(b)(1) had been implemented by the reimbursement of parents for student transportation. *See* n. 17, *supra.*

15, 397 A.2d 1027, with the lack of a full waiver found in *IDEA Public Charter School v. District of Columbia,* 374 F.Supp.2d 158, 165–67 (D.D.C.2005). In *Katz,* the Court of Appeals found a statutory waiver in the enactment of a specific procedure to satisfy judgments against a State agency. 284 Md. at 514–15, 397 A.2d 1027. In *IDEA Public Charter,* a federal district court held that even though Congress had expressly waived the District's 11th Amendment immunity under the IDEA, it had not waived such immunity with respect to a charter school's claim for psychological evaluation services of special education students. The 11th Amendment waiver, the Court said, was intended to protect the rights of a parent of a disabled student to sue, "not to create a private right of action for all interested bodies." 374 F.Supp. at 166.

Section 8–410(b)(1) lacks the stringent waiver language of either of these statutes, but has more in common with the IDEA in its emphasis on the provision of services to disabled students without parental expense, rather than the *Katz* statute's goal of compensating private contractors through facilitating the payment of judgments.

For these reasons, we conclude that § 8–410 does not waive the Board's sovereign immunity and thus, the unjust enrichment judgment must be reversed.

## B. Exhaustion of Administrative Remedies

Late in the proceedings in the circuit court, the Board argued that Koba's suit should be dismissed because the school had not exhausted its administrative remedies before the State Board of Education.[19] It seems odd that the Board is raising this issue, after Koba tried to file an administrative complaint with the State Board over the nonpayment of its transportation costs and was rebuffed. *See* n. 8, *supra.* However, in any event, this argument is without merit.

---

**19.** Although exhaustion arguments are usually raised by a motion to dismiss, in a case such as this, the issue is an omnipresent one that can be raised *sua sponte* on appeal. *See Laurel Racing Ass'n. v. Video Lottery Facility Location Comm'n.,* 409 Md. 445, 458–59, 975 A.2d 894 (2009).

Although under ED § 2–205(e) [20] the State Board has broad appellate powers to resolve controversies involving the provisions of the education laws, such authority is not limitless. In *County Board of Education v. Cearfoss,* 165 Md. 178, 166 A. 732 (1933), the Court of Appeals rejected the contention that the State Board had exclusive jurisdiction over a contract dispute. Distinguishing earlier precedent, the Court noted:

> In none of those cases did the question for determination relate to the legal effect of a contract between an agency of the school system and an individual for the performance of a specified service. Such a question, in our judgment, is not within the initial authority of the county superintendent, or the ultimate power of the State Board of Education, to determine.

*Id.* at 187, 166 A. 732. In addition, the Court has repeatedly emphasized that "the State Board does not have the power to decide purely legal issues." *Resetar v. State Board of Educ.,* 284 Md. 537, 556, 399 A.2d 225 (1979) (collecting authorities).

■ These well-recognized limitations on the State Board's authority apply here. Koba has filed a common law action seeking to impose liability on the basis of a quasi-contract. At the bottom of the dispute is an application of the elements of unjust enrichment and an interpretation of ED § 8–410. These are purely legal issues capable of judicial resolution.[21] The circuit court did not err in rejecting the Board's exhaustion argument.

---

**20.** Section 2–205(e) provides:
(1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:
(i) This article that are within its jurisdiction; and
(ii) The bylaws, rules, and regulations adopted by the Board.
(2) The Board shall decide all controversies and disputes under these provisions.
(3) The decision of the Board is final.

**21.** In two out-of-state cases, local boards of education sought dismissal of unjust enrichment actions asserting that administrative remedies had

## C. Statute of Limitations

The Board argues that Koba's unjust enrichment claim is untimely and foreclosed by limitations. It argues that this cause of action is barred either by 1) the one-year limitation period of the "most analogous" statute, Art. 25A, § 1A; or 2) the 3–year limitation period for civil actions set forth in CJP § 5–101. We believe the Board is partly correct.

As we noted earlier, n. 13, *supra,* Art. 25A, § 1A does not apply to Baltimore City or boards of education. If this case involved a written contract, the one-year limitation period specified in SG § 12–202 would apply. However, because state sovereign immunity has not been waived for quasi-contracts and implied contracts, § 12–202 would hardly be the "most analogous" limitation period.

If sovereign immunity were not in the picture, we believe that the three-year period set forth in CJP § 5–101 would control an unjust enrichment claim. In *City of Baltimore v. Household Finance Co.,* 168 Md. 13, 176 A. 480 (1935), the

---

not been exhausted. In *Satz v. Board of Education of the City of New York,* 118 Misc.2d 676, 461 N.Y.S.2d 692 (1983), the contention was rejected outright:

> Where, as the instant case, what [is] involved is the litigation ... by private parties seeking to vindicate their private rights and where essential questions of law or statutory interpretations are involved and it appears that the school official has acted in violation of an express statute[,] direct resort to the courts is permissible.

*Id.* at 694. In *Archway Programs Inc. v. Pemberton Township Board of Education,* 352 N.J.Super. 420, 800 A.2d 237 (2002), a New Jersey appellate court said that a trial court erred in not temporarily staying its jurisdiction in an unjust enrichment action, but only because "a closely related administrative proceeding pends in the Department of Education." *Id.* at 241. At the same time, the court emphasized:

> The basic proposition that no administrative officer or agency, absent a specific grant of legislative authority, is empowered to decide questions of law, such as those arising in contract actions, applies to the Commissioner of Education even in the context of his plenary authority to decide controversies and disputes arising under the school laws.

*Id.* Here, no administrative proceeding is pending in the State Board and Koba's request for such a hearing was rejected.

Court of Appeals indicated that a claim based on an implied contract was subject to the general three-year statute of limitations, even if the implied contract action were premised on a statutory violation.[22] Similarly, Koba's action is one in quasi-contract for unjust enrichment based on the Board's alleged violation of State law. Thus, it would be subject to the general limitation period contained in CJP § 5–101.

The Board also argues that Koba has failed to file its suit within the three-year limitations period. It asserts that Koba knew the Board would not pay for the transportation costs of the twelve students as early as December 1, 2001, but did not file its complaint until July 6, 2006. The Board also now argues that all but one invoice ($1,120) involved services performed before July, 2003 and that recovery of these costs is barred by § 5–101.[23] Koba responds that it was still receiving payments in 2002 and 2003. The payments were a single month's services for one student in 2003 and two in

---

**22.** The Court quoted at length from the decision of the U.S. Supreme Court in *Metropolitan Railroad Co. v. District of Columbia*, 132 U.S. 1, 12–13, 10 S.Ct. 19, 33 L.Ed. 231 (1889), on whether an implied assumpsit based on a violation of a statute was governed by Maryland's general limitation statute or one governing specialties:

> We think ... that the [lower] court is in error in supposing that the present action is founded on the statute. It is an action on the case upon an implied assumpsit arising out of the defendant's breach of a duty imposed by statute, and the required performance of that duty by the plaintiff in consequence. This raised an implied obligation on the part of the defendant to reimburse and pay to the plaintiff the moneys expended in that behalf. The action is founded on this implied obligation, and not on the statute, and is really an action of assumpsit. The fact that the duty which the defendant failed to perform was a statutory one does not make the action one upon the statute. The action is clearly one of those described in the [general] statute of limitations.

**23.** At trial, the Board moved for judgment at the conclusion of Koba's case. One issue raised at the time was limitations. The Board's lawyer said at one point that "[a ]ll the claims for invoices for services *prior* to 7–03 are barred by the three-year statute of limitations." (Emphasis added). Then he went on to concede that June and July, 2003 invoices for transportation services rendered mostly in May and June for five students, totaling $11,840 were not time-barred by § 5–101 (including an invoice for $1,120 that was paid.) The circuit court denied the Board's motion without discussing the limitations issue.

2002. And the school notes that the last invoice paid was dated July 31, 2003 for services provided from July 14 to July 31, 2003 and for which it received payment on August 31, 2003. Koba also points out that it made a final demand for payment in February, 2004.

■ The key issue here is from what point does the statute of limitations run. In *Dempsey v. McNabb,* 73 Md. 433, 438, 21 A. 378 (1891), the Court of Appeals said that a claim for services on the basis of an implied obligation runs from the time the services are performed. This "last rendition of service" test appears to be the law in most other jurisdictions. *See Baer v. Chase,* 392 F.3d 609, 622–23 (3rd Cir.2004) (collecting cases), and *GSGSB, Inc. v. New York Yankees,* 862 F.Supp. 1160, 1171 (S.D.N.Y.1994) ("[A] cause of action for quantum merit begins to run when the final service has been performed.") However, caselaw generally appears divided over whether a period of demand and refusal is tacked on to the point when services were last rendered.

In *News World Communications, Inc. v. Thompsen,* 878 A.2d 1218, 1225 (D.C.2003), the District of Columbia's highest court held that "[a] claim for unjust enrichment only accrues . . . when the enrichment becomes unjust." Quoting from *Zic v. Italian Gov't. Travel Office,* 149 F.Supp.2d 473, 476 (N.D.Ill. 2001), the D.C. court emphasized that "the essence of a quantum merit claim . . . is not the plaintiff's expectancy of payment, but the unjust enrichment of the defendant and . . . the defendant was unjustly enriched when the services were rendered and when payment was refused." 878 A.2d at 1223. However, in *Rohter v. Passarella,* 246 Ill.App.3d 860, 186 Ill.Dec. 807, 617 N.E.2d 46 (1993), an Illinois court rejected as untimely a tax accountant's quantum merit claims when he waited more than 5 years to file suit after the rendering of his services. Specifically, the court concluded that limitations began to run "as soon as the services were rendered," not "upon presentment and subsequent rejection of a bill for services," because the accountant "could have billed defendants as soon as he rendered his services to them." *Id.,* 186 Ill.Dec.807, 617 N.E.2d at 52.

Apparently echoing a similar refrain is *Henry's Drive-in, Inc. v. Pappas*, 264 Md. 422, 287 A.2d 35 (1972), where the Court of Appeals of Maryland said, *id.* at 428, 287 A.2d 35:

The modern view is that when the maturity of the cause of action is dependent upon the performance of an act within the control of the plaintiff, limitations will run from the time the plaintiff could have acted, without a demand being made. If this were not so, the plaintiff could indefinitely postpone the statutory bar.

In any event, the facts of this case make it unnecessary to resolve this issue. Except for the transportation of one student in July 2003 at a billed and paid cost of $1,120, all of the services were rendered more than three years before suit was filed on July 6, 2006. In addition, except for July 7, 2003 invoices for $4,720, the City School System was billed for the transportation costs and clearly refused payment more than three years before Koba went to court.

To counter the limitations defense, Koba seems to be arguing that partial payments made by the City School System in 2003 and 2003 were an acknowledgment of the entire debt, thus tolling the statute of limitations. This contention is undercut by both the facts and applicable caselaw.

First, it is important to note that Koba's provision of transportation services involved multiple debts, not a single debt. Separate invoices were sent for each student for each month. The August 2002 payment of $3,040 reflected November 30, 2001 invoices for just two students. The August 31, 2003 payment of $1,120 involved just a single student and it was linked to a July 31, 2003 invoice.[24] Clearly, these were not general, undirected and undesignated payments suggestive of a greater obligation to pay. *See Himelfarb v. American Express Co.*, 301 Md. 698, 707, 484 A.2d 1013 (1984) (" 'If within three years before the bringing of the suit, the defendant had admitted a single item of the plaintiff's account to be

---

**24.** The record offers no explanation why these invoices were paid.

due, the plea of limitations would have been defeated as to that item, while it would have been a good bar to all the other items in the account.' ") (Citation omitted).

Second, at most, the August 2002 payment would have started a new period running. *Id.* at 705, 484 A.2d 1013. However, because Koba sued in July 2006, nearly four years later, the claim still would have been barred by the 3–year statute of limitations.

Third, *Himelfarb* noted that, " '[i]n order to make a money payment a part payment within the statute, it must be shown to be a payment of a portion of an admitted debt, and paid to and accepted by the creditor as such, accompanied by circumstances amounting to an absolute and unquestionable acknowledgment of more being due, from which a promise may be inferred to pay the remainder.' " *Id.* at 707, 484 A.2d 1013. (citations omitted.) It would be blinking reality to read such a commitment in the unexplained, isolated and single-item payments by the City School System in 2002 and 2003. For these reasons, we reject Koba's partial payment argument.

This does not end the matter, however. The Board's lawyer admitted in open court that claims based on $10,720 in unpaid invoices were not time-barred by § 5–101.[25] *See* n. 23, *supra.* Although not conceding these items in this Court, this admission in the circuit court is clearly a waiver of limitations as to the June–July invoiced amounts.

For these reasons, if Koba's claim were not precluded by the doctrine of sovereign immunity, the lion's share of any award would be barred by limitations, but not the sum of $10,720.

## D. Unjust Enrichment

The Board has proffered numerous arguments why the court and jury were incorrect in finding the elements of unjust enrichment. However, we need not consider all of them.

■ Unjust enrichment consists of three elements:

---

**25.** This figure excludes the $1,120 invoice that was paid.

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Hill v. Cross Country Settlements*, 402 Md. 281, 295, 936 A.2d 343 (2007).

Integral to Koba's attempt to demonstrate these elements is its assertion that the Board violated its statutory duty under ED § 8–410(b)(1) to pay transportation costs for the twelve disabled City students housed in a group home in Talbot County and transported to Koba's school in Anne Arundel County.[26] If the Board had such a statutory duty, it could plausibly be found that the City School System had knowledge of the benefit it was receiving when Koba arranged for transportation services and that Koba was not acting as an officious intervenor or volunteer in performing the Board's duty.[27] In our view, a proper understanding of § 8–410,

---

**26.** In its brief, Koba now argues that its claim for unjust enrichment is "not solely" based on § 8–410. However, the jury was instructed in the language of the statute and even given a copy of the law to take back to the jury room. At one point Koba's counsel told the court "Our case is based on the legal obligations that Baltimore City has."

**27.** *Restatement of the Law*, Restitution, § 113 provides:

A person who has performed the noncontractual duty of another by supplying a third person with necessaries which in violation of such duty the other had failed to supply, although acting without the other's knowledge or consent, is entitled to restitution therefor from the other if he or she acted unofficiously and with the intent to charge therefor.

Comment *a* notes that "the necessity of protecting the interests of persons entitled by law to have things or services supplied to them by another ordinarily prevents the intervention even of a stranger from being officious." Comment *c* includes education in the term "necessaries." Comment *b* contains the following cogent observation:

The rule stated in this Section applies to towns and other divisions of government. However, the interpretation of statutes imposing a duty upon such organizations must be considered in determining the right to restitution, and any conditions provided for in the statute....

particularly, how it interacts with other key provisions of law relating to transportation of disabled students, will shed light not only on whether the Board has a duty to pay, but also whether it has received a "benefit" for purposes of an unjust enrichment claim.

Education Article § 8–403 provides:

(a) The *State and each local school system* shall make a free appropriate public education available to each child with a disability, as provided by this subtitle.

(b) Appropriate special education and *related services* are available to a child with a disability from birth through the end of the school year in which the child turns 21 years of age.

(Emphasis added.) Under ED § 8–401(a)(3), a "[f]ree appropriate public education" includes the provision of "related services" and under ED § 8–401(a)(5), "[r]elated services," includes "transportation . . . as may be required to assist a child with a disability to benefit from special education."

Education Article § 4–122 deals with funding a public school program for children in "an out-of-county living arrangement" and distinguishes between a "[f]inancially responsible county,"—generally where the parents reside—and the "[s]ervice providing local education agency," where the child is placed. § 4–122(a)(3) and (5). Section 4–122(c) imposes certain educational costs on the financially responsible county. However, § 4–122(c)(4) provides:

If the service providing local education agency determines that a child in an out-of-county living arrangement is handicapped and needs a *nonpublic educational program* as provided by § 8–406 of this article, the *financially responsi-*

---

Further, the duty may exist only if there are available funds. Thus, where a statute provides that towns are to furnish transportation for school children, this duty may be limited to towns the treasuries of which have funds available for such purpose.

*ble county shall pay* for each such child the amount provided by § 8–415(d)(3) of this article.[28]

(Emphasis added.)

Education Article § 8–406(b)(1) states that "[a] child with a disability who needs special education *and related services* that cannot be provided in a public county, regional, or State program shall be placed in an appropriate nonpublic education program that offers the service." (Emphasis added.) Section 8–406(c)(1) provides that "[t]he cost of the nonpublic educational program shall be *paid by the State and the county in which the child is domiciled* in accordance with § 8–415(d) of this subtitle, as appropriate." (Emphasis added.) [29]

A key component of these interrelated provisions is ED § 8–415(d), which provides:

(1) In this subsection, "basic cost" as to each county, means the average amount spent by the county from county, State, and federal sources for the public education of a nonhandicapped child. "Basic cost" does not include amounts specifically allocated and spent for identifiable compensatory programs for disadvantaged children.

(2) As provided in paragraphs (3) and (4) of this subsection, *the State and the counties shall share collectively in the cost of educating children with disabilities in nonpublic programs under § 8–406 of this subtitle.*

(3)(i) Subject to the limitation under subparagraph (ii) of this paragraph, *for each of these children domiciled in the county, the county shall contribute for each placement* the sum of:

(1) The local share of the basic cost;

---

**28.** A fair reading of the terms "educational program" is that it includes related services such as transportation. *See* ED § 8–406(b) and (c).

**29.** Section 8–401(b) of the ED Article provides: "In the subtitle, the domicile of a child with a disability is the county in which the parent or guardian who has legal custody of the child is domiciled. As noted earlier, the cited provisions for purposes of the ED Article, the word "county" includes Baltimore City, ED § 1–101(c) and § 1–202."

(2) An additional amount equal to 200 percent of the basic cost; and

(3)A. For fiscal year 2009, an additional amount equal to 20 percent of the approved cost or reimbursement in excess of the sum of items 1 and 2 of this subparagraph; and

B. For fiscal year 2010 and each subsequent fiscal year thereafter, an additional amount equal to 30 percent of the approved cost or reimbursement in excess of the sum of items 1 and 2 of this subparagraph.

(ii) The amount that a county is required to contribute under subparagraph (i) of this paragraph may not exceed the total cost or reimbursement amount approved by the Department.

(4) For *each of these children, the State shall contribute an amount* equal to the amount of the approved cost or reimbursement in excess of the amount the county is required to contribute under paragraph (3) of this subsection.

(Emphasis added.)

A final piece of this puzzle is ED § 5–205, which provides grants to local boards for student transportation services. Section 5–205(a) states:

The State shall distribute grants as provided under this section *to the county boards to provide transportation services* for public school students and *disabled children for whom transportation is to be provided under § 8–410 of this article.* Appropriations for student transportation shall be budgeted in a separate budget category as provided in § 5–101 of this title. If the amount that is appropriated to a county under this section in a fiscal year is more than the actual cost of providing student transportation services in that county, a county board may apply any excess funds to costs of pupil transportation in subsequent years. None of these funds may be paid to or claimed by any subdivision, nor may many of these funds be reverted to any subdivision. A county board may not transfer State revenues from the

student transportation category to another category as a result of this section.

(Emphasis added.)

Subsection (b) establishes a base grant amount for each jurisdiction and subsection (c) sets forth a formula for increasing the grant. Subsection (d) provides:

For each fiscal year, in addition to the base grant for student transportation provided under subsection (c) of this section, a disabled student transportation grant shall be distributed to each county board. The amount of the grant to each board shall be equal to the product of the number of disabled students requiring special transportation services who are transported by the county board in the previous fiscal year and:

(1) $600 in fiscal year 2004;

(2) $700 in fiscal year 2005;

(3) $800 in fiscal year 2006;

(4) $900 in fiscal year 2007; and

(5) $1,000 in fiscal year 2008 and each fiscal year thereafter.[30]

Finally § 5–205(e) states:

For the purposes of determining the amount of the grant provided under subsection (d) of this section, the State Board shall develop a procedure and adopt regulations for determining the number of disabled students transported in each jurisdiction in the previous fiscal year.[31]

---

**30.** With a different formula, this grant program was in place between 2001 and 2003.

**31.** Regulations of the State Board set forth this procedure:

A. Grants for the transportation of students with disabilities in the amount specified in Education Article, § 5–205, Annotated Code of Maryland, shall be distributed on a bimonthly basis.

B. The disabled student transportation grant shall be distributed to each local board of education. The amount of the grant shall be based upon the number of disabled students requiring special trans-

With an eye on these interrelated provisions (some of which have changed, but without impacting the major events in this case), we now turn back to ED § 8–410(b)(1), which once again provides:

[T]he local school system of the county in which the child with a disability resides shall certify and pay the cost of his daily or other reasonable transportation to school under the rules and regulations adopted by the State Board if:

(i) The school is outside this State or the county in which the child resides; and

(ii) State aid has provided for the education of the child under this subtitle.[32]

In light of the provisions quoted on pages 26–29, particularly ED §§ 8–406(c), 4–122(c) and 8–415(d)(3), it is difficult to look at the words "the county in which the child with a disability resides," and to embrace the Board's view that it does not mean the subdivision where the disabled "child" (*i.e.*, the parent) is domiciled. Moreover, it is a general rule of construction in Maryland that the words "resided" or "resides" in a statutory provision means "domiciled" or "domicilary," unless a contrary intent is shown. *Roberts v. Lakin,* 340 Md. 147, 153, 665 A.2d 1024 (1995) (collecting cases). Finally, under Maryland caselaw, a temporary removal to another habitation does not result in the abandonment of a person's domicile. *Blount v. Boston,* 351 Md. 360, 371–73, 718 A.2d 1111 (1998). In our view, for purposes of § 8–410(b)(1), the twelve special education students receiving transportation "resided" in Baltimore City and the Board has misread this statute. This does not translate, however, into an automatic

---

portation services who were transported by a local board of education, on the last Friday of October of the prior fiscal year. COMAR 13A.06.07.18. State budget books also note under R00A02.39, *Transportation—Aid to Education:* "State aid is also provided based on special education ridership." 3 *Maryland Budget FY 2011* at III–69.

32. The State Board regulations referred to in the statute are found at COMAR 13A.06.07.01 *et seq.* Except for COMAR 13A.06.07.18, *see* n. 31, *supra,* the regulations have no bearing on this controversy.

finding of a "benefit" to the Board or one that is "unjust" for the Board to have received.

In his closing argument to the jury, Koba's counsel pointed to a number of indicators of "benefit" to the Board:

(1) Payment of the invoice in 2001 and isolated payments in 2002 and 2003 "confirms the benefit";

(2) The Board benefitted from its arrangement with Koba because "the Board had an obligation to certify and pay for these transportation costs"; and

(3) The Board received millions of dollars in State aid in FY 2003 to transport disabled students.

In this Court, Koba argues that the Board received a "cash benefit" to which it was not entitled "because Koba has paid for these transportation expenses which [the Board] was required to dip into its treasury to pay as a matter of its legal obligation." Appellant adds that funds in the account of the Board "were further enriched by cash received directly or indirectly from the State of Maryland; and through the State of Maryland, from the Federal Government through . . . IDEA grants."

As a matter of law, we find that none of these contentions amount to a legally cognizable benefit, whose receipt would have been unjust. The mere nonpayment for services does not constitute unjust enrichment. *Castillo v. Barrera*, 146 Cal.App.4th 1317, 53 Cal.Rptr.3d 494, 503 (App. 2007). Because the profit or advantage to the defendant is a key element in an unjust enrichment action, it is difficult to see how payments to the plaintiff confer that profit or advantage. Nor do such payments by the Board "confirm" a benefit, as Koba argues. For the same reason, Koba's billings, which were the obvious basis for the amount of the judgment here, do not mean a benefit was conferred. *See Granite Construction Co., supra*, 57 Md.App. at 775, 471 A.2d 1121 (In an unjust enrichment action, "the measure of recovery is the gain to the defendant, not the loss by the plaintiff.") Koba's other contentions—the Board's statutory obligation to

transport and the receipt of appropriations to perform that function—carry with them their own counter-argument.

The litany of statutory provisions recited at pp. 424–27, 4 A.3d at 75–77, *supra*, demonstrates that the duty to fund the transportation of disabled students, both in and outside the particular jurisdiction, is a shared obligation of the State and the subdivisions. The Board has a duty to pay for the transportation, *if* it receives or can receive reimbursement for those expenditures, *see* n. 17 *supra*. The City School System can no longer be reimbursed for the transportation of the twelve students for 2001–03, because they obviously were not included in the ridership head-count by the deadline specified in COMAR 13A.06.07.18. *See* n. 31, *supra*. Koba made no showing at trial that the Board can now be reimbursed for transportation of the twelve students. Rather, appellee argues, on the basis of our decision in *Alternatives, supra*, that receipt by the Board of State funding for transportation is the benefit that makes its claim viable. However, *Alternatives* says only that when State monies forwarded to the Board are "the direct result" of the services provided, then a cash benefit may exist. 155 Md.App. at 506, 843 A.2d 252. Under *Alternatives*, the plaintiff must show that "because of" the services provided to the City School System, the Board received a certain amount of funding to which it "would not otherwise have been entitled." *Id.* at 497, 843 A.2d 252. Koba has made no showing of direct causation between its provision of transportation services and additional State moneys forwarded to the City School System. In fact, because the cost of transporting twelve students was not included in the ridership headcount, the Board probably received less funds than it would have been entitled, and the State—a non-party here— was the beneficiary in having to appropriate less.

Koba's suggestion that the Board received a benefit because it did not expend funds from its transportation budget, miscomprehends the role of these funds. They are not the Board's to keep for any use it desires, but to spend on the transportation of disabled children; and presumably that was what the funds were used for from 2001–2003 and in later

years. If any benefit existed, it was passed on to other children in the fulfillment of the Board's statutory duties.

Finally, in determining whether any receipt of benefit by the Board was unjust, it cannot be overlooked that Koba arranged for the cost of transportation of the children in order to receive the far more substantial payments of tuition from the City School System.[33] *See* Appellee's Brief at 2. ("Koba had to arrange transportation to provide the educational services required by the Individual Educational Plan for the children.")

For all of these reasons, we conclude that Koba's unjust enrichment claim would have failed even if not barred by sovereign immunity or limitations.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE EVENLY DIVIDED BETWEEN THE PARTIES.**

---

**33.** In the record, there are checks showing as much as $73,000 in tuition payments to Koba for just a single month.